**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1615**

———————

MICHAEL ANTWI ADJEI,

        Petitioner – Appellant,

   v.

ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of Homeland
Security; TRACY RENAUD, in her official capacity as Acting Director, United States
Citizenship and Immigration Services; KIMBERLY ZANOTTI, in her official capacity as
Field Office Director, USCIS Washington Field Office,

        Respondents – Appellees.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Liam O'Grady, Senior District Judge.  (1:20-cv-01098-LO-JFA)

———————

Argued:  October 27, 2022                      Decided:  February 7, 2023

———————

Before WILKINSON and HEYTENS, Circuit Judges, and MOTZ, Senior Circuit Judge.

———————

Reversed and remanded with instructions by published opinion.  Senior Judge Motz wrote
the majority opinion, in which Judge Heytens joined.  Judge Wilkinson wrote a dissenting
opinion.

———————

**ARGUED:**  Annigje Johanna Buwalda, JUST LAW INTERNATIONAL P.C., Fairfax,
Virginia, for Appellant.  Catherine M. Yang, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Jason West, JUST LAW
INTERNATIONAL P.C., Fairfax, Virginia, for Appellant.  Raj Parekh, Acting United

States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

_____

DIANA GRIBBON MOTZ, Senior Circuit Judge:

We consider here whether the Commonwealth of Virginia would recognize a divorce granted by a foreign nation to its own citizens when neither spouse was domiciled in that nation at the time of the divorce. The question arises from Michael Antwi Adjei's marriage to Barbara Boateng after Boateng and Kingsley Kwame Gyasi — both Ghanaian citizens — divorced pursuant to Ghanaian customary law. At the time of the divorce, Boateng and Gyasi were lawful permanent residents of the United States and neither was present or domiciled in Ghana. Based on his marriage to Boateng, Adjei became a lawful permanent resident of the United States. But when Adjei applied to become a naturalized citizen, United States Citizenship and Immigration Services (USCIS) determined that he and Boateng were not validly married. USCIS reasoned that under controlling Virginia law, the Commonwealth would not recognize a divorce granted by a nation where neither spouse was domiciled at the time of the divorce. Adjei sought review of the decision in the district court, which granted summary judgment to USCIS. Adjei then brought this appeal. We conclude that, as a matter of comity, Virginia would recognize this otherwise valid divorce, granted by a foreign nation to its own citizens, regardless of the citizens' domicile at the time. We therefore reverse and remand with instructions to grant Adjei's naturalization application.

## I.

Adjei, a native and citizen of Ghana, entered the United States in 1996. He met Janet (now Barbara) Boateng, also a native and citizen of Ghana, on December 31, 1999, and the couple married in Virginia in April of 2001.

3

Boateng had been married before.  In 1996, she and Kingsley Kwame Gyasi were married in Accra, Ghana, under Ghanaian customary law.  A few years later, Gyasi received a diversity visa, which permitted Gyasi and Boateng to immigrate to the United States as lawful permanent residents.  *See Nyaga v. Ashcroft*, 323 F.3d 906, 907–08 (11th Cir. 2003) (explaining the diversity visa program).  They were admitted to the United States and settled in Northern Virginia in June of 1999.  Sometime later, their relationship broke down.  Gyasi moved to Minnesota in search of better employment opportunities and the couple agreed to divorce.

In accordance with Ghanaian customary law, Boateng and Gyasi contacted their respective families in Ghana, and the heads of each household performed a ceremonial divorce on January 6, 2000.  Although both Boateng and Gyasi were citizens of Ghana, neither was present or domiciled in Ghana at the time of the divorce.  A year later (on April 5, 2001) the head of Boateng's family and the head of Gyasi's family filed a declaration attesting to this divorce.  The Circuit Court of Tema, Ghana, subsequently affirmed the validity of Boateng's divorce under Ghanaian law.

Three weeks after the declaration was filed and more than a year after Boateng's divorce, Boateng and Adjei married in Virginia.  Boateng then filed an I-130 petition requesting USCIS issue an immigrant visa to Adjei, her new husband.  USCIS granted Boateng's petition in March 2005.  Adjei then applied for an adjustment to permanent resident status.  USCIS granted his request in January 2010.

In 2014, Adjei applied to become a naturalized citizen of the United States.  USCIS denied his application, determining Adjei had not, in fact, lawfully obtained permanent

resident status.  USCIS ultimately offered a single basis for its decision: Virginia, it believed, would not recognize Boateng's divorce from Gyasi because neither spouse was domiciled in Ghana at the time of the divorce.

Adjei sought reversal of the denial of his naturalization application in the Eastern District of Virginia.  Both Adjei, on the one hand, and the Secretary of the Department of Homeland Security, the Director of USCIS, and the Director of USCIS' Washington Field Office (collectively, USCIS), on the other, moved for summary judgment.  The parties agreed there were no disputed issues of material fact and that the case turned entirely on whether the Commonwealth of Virginia would recognize Boateng's divorce from Gyasi.  The district court granted summary judgment to USCIS, reasoning that Virginia would not recognize a divorce granted by a jurisdiction where neither spouse was domiciled at the time of divorce.  Adjei timely filed this appeal.

## II.

"Courts review a decision denying a naturalization application de novo." *Dung Phan v. Holder*, 667 F.3d 448, 451 (4th Cir. 2012) (citing 8 U.S.C § 1421(c)).  We review cross-motions for summary judgment under the same standard, considering "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 189 n.2 (4th Cir. 2022) (quoting *Bacon v. City of Richmond*, 475 F.3d 633, 637–38 (4th Cir. 2007)).

To be eligible for naturalization, an applicant must demonstrate he was "lawfully admitted for permanent residence." *Injeti v. USCIS*, 737 F.3d 311, 315 (4th Cir. 2013)

(quoting 8 U.S.C. § 1427(a)).[1]   Deferring to the Board of Immigration Appeals' interpretation of the term "lawfully," we have held that an applicant for naturalization must do more than simply show he was granted lawful permanent resident status. *Id.* at 316. Rather, he must "demonstrate that the grant of that status was 'in substantive compliance with the immigration laws.'" *Id.* (quoting *Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010)).

Adjei obtained an immigrant visa and became eligible to apply for lawful permanent resident status through his marriage to Boateng.  A spousal petition for an immigrant visa must "provide evidence of the claimed relationship," including "proof of the legal termination of all previous marriages" of both the petitioning spouse and the spouse for whom the visa is sought.  8 C.F.R. § 204.2(a)(2).  When the legality of the claimed marriage turns on an earlier divorce, USCIS "look[s] to the law of the state where the subsequent marriage was celebrated" to determine the validity of the divorce.  *Jahed v. Acri*, 468 F.3d 230, 235 (4th Cir. 2006) (alteration in original) (quoting *Matter of Hosseinian*, 19 I. & N. Dec. 453, 455 (BIA 1987)).  In this case that is Virginia — where Boateng's subsequent marriage to Adjei was celebrated.

To determine whether Virginia would recognize Boateng's divorce from Gyasi, we "look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications." *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016) (quoting

---

[1] Boateng herself became a United States citizen in 2005.  Accordingly, when Adjei applied for naturalization, he indicated he was subject to the shorter continuous residency period set out in 8 U.S.C. § 1430(a).  But that provision, like § 1427(a), requires the applicant to have been "lawfully admitted for permanent residence."

*Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998)). That court need not have decided the precise question at issue. Rather, it suffices if its decisions, fairly read, direct "a particular conclusion." *Assicurazioni*, 160 F.3d at 1002.

III.

An out-of-state divorce may be recognized in Virginia either under the Full Faith and Credit Clause of the United States Constitution or as a matter of comity.

The Full Faith and Credit Clause, U.S. Const. art. IV § 1, commands "each state to recognize and give effect to valid judgments rendered by the courts of its sister States." *V.L. v. E.L.*, 577 U.S. 404, 406–07 (2016). Thus, when a state with jurisdiction to do so grants a divorce "in accord with the requirements of procedural due process," the Constitution compels that all other states recognize it. *Williams v. State of N.C.* (*Williams I*), 317 U.S. 287, 303 (1942). This is true even if the divorce offends the public policy of the recognizing state. *Estin v. Estin*, 334 U.S. 541, 546 (1948).

Comity, on the other hand, "is not a matter of obligation." *McFarland v. McFarland*, 19 S.E.2d 77, 83 (Va. 1942). Instead, "[i]t is a matter of favor or courtesy, based on justice and good will." *Id.* It is the recognition one sovereign extends to the acts of another, "having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

Of course, the Full Faith and Credit Clause does not apply to the judgments of foreign nations. *Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 591 (4th Cir. 2002).

7

Thus, as Adjei recognizes, Boateng's Ghanaian divorce is valid in Virginia only if Virginia would recognize it as a matter of comity.

IV.

The Supreme Court of Virginia has emphasized the importance of comity for fostering good relations between sovereigns and promoting judicial economy.[2] *Am. Online, Inc. v. Nam Tai Elecs., Inc.*, 571 S.E.2d 128, 132 (Va. 2002). Nevertheless, the court has announced four principles that "must be considered" before extending comity to the act of another sovereign. *Id.* at 133. The Commonwealth will only grant comity to an act of another sovereign if (1) the other sovereign had jurisdiction "to enforce its order within its own judicatory domain," (2) the relevant law of the other sovereign is "reasonably comparable to that of Virginia," (3) the decree was not obtained through fraud, and (4) enforcement of the other sovereign's decree would not be "contrary to the public policy of Virginia." *Id.*

The first and third requirements are not at issue here. As to the first, USCIS acknowledges that Boateng and Gyasi's divorce is valid in Ghana. Reply Mem. Supp. Resp.'s Mot. Summ. J. at 2 n.2. In fact, a Ghanaian court has expressly confirmed the validity of the divorce under Ghanaian law. There is thus no question Ghana had jurisdiction to enforce the divorce "within its own judicatory domain." *Am. Online*, 571

---

[2] Boateng's divorce from her first husband was accomplished via Ghanaian customary law, rather than by court order, but neither party argues a declaration sufficient to dissolve a divorce under Ghanaian law should be treated differently from a divorce granted by a Ghanaian court for the purposes of comity. *See Restatement (Third) of Foreign Relations Law* § 484 n.6 (1987) (explaining that "the same rules of recognition" generally apply to nonjudicial divorces as to judicial divorces).

S.E.2d at 133. As to the third requirement, no party suggests that the divorce was obtained through, or tainted by, fraud. Accordingly, recognition of the divorce in Virginia turns entirely on the second and fourth *America Online* requirements. We consider each of them in turn.

### A.

With respect to the second *America Online* requirement, we must determine whether the law of Ghana, which grants divorces to its citizens even when those citizens are domiciled outside of Ghana, is "reasonably comparable to the law of Virginia." *Am. Online*, 571 S.E.2d at 133.

Virginia, like most of her sister states, will only grant a divorce if at least one spouse is domiciled in Virginia at the time of the divorce. Va. Code Ann. § 20-97; *Blackson v. Blackson*, 579 S.E.2d 704, 709 (Va. Ct. App. 2003). Moreover, Virginia will not recognize a divorce granted by a sister state unless one spouse was domiciled in that state at the time of the divorce. *Howe v. Howe*, 18 S.E.2d 294, 298 (Va. 1942). Relying on *Howe*, USCIS argues that Virginia also would not recognize a divorce granted by a foreign nation unless one spouse was domiciled in the foreign nation at the time of the divorce. Resp. Br. at 14–15.

But when the *Howe* court rejected Arkansas' authority to grant a divorce to a man domiciled in North Carolina, it reasoned that "[f]or the purposes of citizenship," the man had no more relation to Arkansas than any temporary visitor would have. 18 S.E.2d at 296. Rather, he "stood exactly as he would have stood had he gone to hunt bear in the canebrakes

of that State." *Id.* In doing so, *Howe* emphasized the power of *both* domicile and citizenship to provide a sovereign authority over its own people. *See id.* at 296–97.

Moreover, no Virginia appellate court has ever refused to recognize a divorce obtained in a foreign country by citizens of that country because neither spouse was domiciled there at the time of the divorce. This is unsurprising, given that the concerns that have animated the Supreme Court of Virginia's treatment of divorces granted by a sister state when neither spouse was domiciled in that state simply are not present when a foreign nation grants a divorce to its own citizens. Virginia considers divorces granted by a sister state to two non-domiciliaries problematic because a state in which neither party is domiciled usually lacks a connection to the parties that would justify its exercise of control over the spouses' marital status. *See Evans v. Asphalt Rds. & Materials Co.*, 72 S.E.2d 321, 326–27 (Va. 1952). In *Howe*, for example, the court explained that the North Carolina man who sought a divorce in Arkansas without intending to remain in Arkansas was no more than a "sojourner" in that state. 18 S.E.2d at 297.

This concern does not exist when a foreign nation, like Ghana, grants a divorce, valid under its own laws, to its own citizens. As several courts have explained, "a country . . . may have a legitimate interest in the marital status of the parties, even though it does not accept the common law jurisdictional concept of domicile." *Scott v. Scott*, 331 P.2d 641, 644 (Cal. 1958) (Traynor, J., concurring); *see also Perrin v. Perrin*, 408 F.2d 107, 110–11 (3d Cir. 1969) ("[D]omicile is not intrinsically an indispensable prerequisite to jurisdiction[.]"). Indeed, the *Restatement of Foreign Relations Law* suggests a foreign nation has an interest in the marital status of its *citizens*, even if they are not currently

10

domiciled in that nation. *Restatement (Third) of Foreign Relations Law* § 484 n.1 (1987) (noting that "other substantial connections between the rendering state and a party, for example nationality, may suffice to justify recognition of a divorce"). Several international agreements similarly recognize that citizenship in the country where the divorce is sought, like domicile and habitual residence, provides a legitimate and independent basis upon which a country may grant a divorce. *See* Hague Convention on the Recognition of Divorces and Legal Separations art. 2(3), June 1, 1970, 978 U.N.T.S. 393; Council Regulation 2019/1111, art. 3(b), 2019 O.J. (L 178) 19.

The dissent disputes the relevance of these authorities while ignoring that the Supreme Court of Virginia itself recognized the connection between citizenship and a sovereign's authority to grant a divorce more than eighty years ago. Rather than accept the significance of the *Howe* court's reasoning, the dissent relies on cases that emphasize the importance of domicile to each *state's* jurisdiction to grant a divorce. But this gets it backwards. The domicile requirement rests on each state's "right to regulate the domestic affairs of [its] citizens." Rhonda Wasserman, *Divorce and Domicile: Time to Sever the Knot*, 39 Wm. & Mary L. Rev. 1, 17 (1997); *see also* Michael M. O'Hear, Note, *"Some of the Most Embarrassing Questions": Extraterritorial Divorces and the Problem of Jurisdiction Before* Pennoyer, 104 Yale L.J. 1507, 1525 (1995). In fact, in the influential early case *Ditson v. Ditson*, the Supreme Court of Rhode Island expressly grounded each state's right to control the marital status of its domiciliaries on the more general principle that each "country or nation" has a "right . . . to determine the status of one of its own citizens." 4 R.I. 87, 87 (1856). It follows that when citizenship does not depend on

11

domicile, neither does "the right of a . . . nation to determine the status of one of its own citizens." *Id.*; *see also Restatement (Third) of Foreign Relations Law* §§ 402(2), 421(2)(d).

Citizenship in a nation, like domicile in a state, "implies a nexus between person and place of such permanence as to control the creation of legal relations." *Williams v. State of N.C.* (*Williams II*), 325 U.S. 226, 229 (1945); *see also Evans*, 72 S.E.2d at 324. Thus, the citizenship of both parties in a nation provides that nation with a jurisdictional basis for granting the parties a divorce that seems "reasonably comparable" to the relationship between a state and its domiciliaries. For these reasons, we believe that, if faced with the question, the Supreme Court of Virginia would consider Boateng and Gyasi's citizenship in Ghana, the nation in which the divorce was granted, to be an acceptable alternative to domicile.[3]

---

[3] In *Jahed v. Acri*, we predicted that Virginia would not recognize a Pakistani divorce granted to Afghan citizens who were domiciled in the United States at the time of the divorce. 468 F.3d at 236 n.5. This is entirely consistent with our holding today. Because Jahed's parents were not citizens of Pakistan, citizenship did not offer an alternative basis for jurisdiction. The same is true for American citizens who obtain divorces abroad — domicile remains critical to the validity of a divorce granted by one nation not to its own citizens, but to citizens of another nation. *See Harrison v. Harrison*, 214 F.2d 571, 573 (4th Cir. 1954).

B.

We turn to the fourth *America Online* requirement: whether recognition of a divorce obtained in the absence of domicile would be contrary to the public policy of the Commonwealth.

USCIS maintains that Virginia Code § 20-97 compels the conclusion that any divorce issued in the absence of domicile violates the public policy of Virginia. *See* Resp. Br. at 17. The relevant portion of § 20-97 provides only that:

> No suit for annulling a marriage or for divorce shall be maintainable, unless one of the parties was at the time of the filing of the suit and had been for at least six months preceding the filing of the suit an actual bona fide resident and domiciliary of the Commonwealth.

Va. Code Ann. § 20-97. This statute simply establishes that domicile is required for Virginia's own courts to grant a divorce. It does not prohibit the recognition of out-of-state divorce decrees granted in the absence of domicile.

Nor does it follow that Virginia would refuse to recognize, as a matter of comity, a divorce issued by a foreign nation simply because Virginia itself would not grant a divorce under similar circumstances. *Cf. McFarland*, 19 S.E.2d at 84 ("[L]ack of reciprocity is not generally regarded as a basis for the denial of comity."). This is especially true where, as here, the basis for the foreign nation's jurisdiction to grant the divorce is the divorcing parties' citizenship in that nation, a basis that has no independent analogue in the domestic context. Of course, Virginia could, as some states do, expressly forbid the recognition of all out-of-state divorces where both spouses are domiciled in the state where recognition is

13

sought. *See, e.g.*, Neb. Rev. Stat. § 42-341; N.H. Rev. Stat. Ann. § 459:1. But Virginia law does not so provide.[4]

Furthermore, the Supreme Court of Virginia has repeatedly recognized that the public policy of Virginia favors recognizing divorces whenever possible, so that one's marital status does not change with one's location. *See Newport v. Newport*, 245 S.E.2d 134, 139 (Va. 1978); *Humphreys v. Humphreys*, 123 S.E. 554, 561 (Va. 1924). And where, as here, the divorce is followed by a subsequent marriage, the Commonwealth's interest in uniformity in marital status is reinforced by an even more foundational aspect of its public policy: "uphold[ing] the validity of the marriage status as for the best interest of society." *Levick v. MacDougall*, 805 S.E.2d 775, 778 (Va. 2017) (quoting *Needam v. Needam*, 33 S.E.2d 288, 290 (Va. 1945)).

The importance of recognizing out-of-state divorces has only increased with advances in transportation. More than 50 years ago, in an often-cited opinion, New York's highest court explained that in "a highly mobile era . . . it is needful on pragmatic grounds to regard the marriage itself as moving from place to place." *Rosenstiel v. Rosenstiel*, 209 N.E.2d 709, 712 (N.Y. 1965). The world has become even smaller and more mobile since then. *See* Ann Laquer Estin, *Marriage and Divorce Conflicts in International Perspective*,

---

[4] Indeed, § 20-97 itself indicates that domicile, at least in the traditional sense, is not an invariable requirement for recognition of a divorce in Virginia. Traditionally, "[t]o change domiciles, a person must intend to make the new place her home." *Jahed*, 468 F.3d at 236; *Howe*, 18 S.E.2d at 297. But to accommodate members of the Armed Services serving a tour in Virginia, even those who do not intend to make Virginia their home, the Commonwealth presumes, for purposes of jurisdiction to grant a divorce, that those stationed in the Commonwealth for six months are domiciled in Virginia. Va. Code Ann. § 20-97.

27 Duke J. Comp. & Int'l L. 485, 516 (2017) (explaining that "[g]lobalization has heightened the importance of a durable and portable family status").

Given these precedents, we believe when, absent any fraud, a couple has married relying on a consensual divorce granted by a foreign nation to its citizens and in accordance with its laws, Virginia public policy would favor recognition of the divorce upon which the second marriage's legitimacy depends.

V.

In sum, Boateng and Gyasi's divorce satisfies each of the preconditions Virginia has imposed on the doctrine of comity. A divorce obtained in a foreign nation by its own citizens is not invalid in Virginia simply because these citizens were not domiciled in their home country at the time of the divorce. Their citizenship in that country provides an adequate relationship between person and place to justify the foreign nation's exercise of control over their marital status. Thus, as a matter of comity — which requires "due regard both to international duty and convenience, and to the rights . . . of other persons who are under the protection of its laws," *Hilton*, 159 U.S. at 164 — we believe Virginia would recognize Boateng's divorce from her first husband.[5]

---

[5] In *Annan v. Lynch*, 202 F. Supp. 3d 596, 597, 604–06 (E.D. Va. 2016), the district court recognized a Ghanaian customary divorce under similar circumstances because it satisfied the test set out in *Matter of Ma*, 15 I. & N. Dec. 70 (BIA 1974). While we agree with the holding in *Annan*, we do not agree with its rationale. *Matter of Ma* applies only when there has been no subsequent marriage, and neither *Matter of Ma* nor the cases it relied on apply Virginia law. The *Annan* court should have looked to the requirements for recognition set out in *America Online*.

In so holding, we emphasize a critical difference between Virginia's obligations under the Full Faith and Credit Clause and its discretion when extending comity. A state may not disregard a judgment rendered by a sister state simply because it disagrees with the "policies reflected in the judgment." *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (quoting *Estin*, 334 U.S. at 546). In that context, focusing on the domicile of the spouses — and thus on the divorcing state's jurisdiction over their marital status — is the only effective means for a state to ensure that its social policies are not undermined by proceedings in a sister state with no legitimate interest in the marriage. *Williams II*, 325 U.S. at 230. By contrast, the Commonwealth may refuse to recognize a foreign divorce as a matter of comity if the divorce or the manner in which it was obtained offends Virginia law or public policy. We reject only USCIS's argument that, pursuant to present Virginia law, the Commonwealth would refuse to recognize a divorce granted by foreign nation to its own citizens simply because neither was domiciled in the foreign nation at the time of the divorce.

Accordingly, we reverse the judgment of the district court and remand with instructions to grant Adjei's application for naturalization.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

WILKINSON, Circuit Judge, dissenting:

At issue is whether the Commonwealth of Virginia would recognize a divorce granted by a foreign country, Ghana, to two Ghanaian citizens who were neither domiciled nor present there at the time of the divorce. Michael Adjei seeks to establish the validity of his wife's prior Ghanaian divorce in order to demonstrate that he properly became a lawful permanent resident based on his marriage to her and is therefore eligible for naturalization.

The majority does not dispute that Virginia has long refused to recognize divorces granted by other states unless at least one spouse was domiciled in the divorcing jurisdiction. Nor does it dispute that Virginia itself will not grant a divorce unless at least one spouse is a domiciliary of the Commonwealth. Instead, the majority hypothesizes that Virginia would extend comity to a foreign *country's* divorce decree as long as the spouses were citizens of that country. Maj. Op. at 12. The majority surmises based on a hodgepodge of non-Virginia sources that the Virginia Supreme Court would hold that citizenship, even without domicile, creates a sufficient relationship with the divorcing country to justify that country's exercise of jurisdiction. *Id.* at 9–12.

Not so. The majority has concocted a pre-*Erie* federal-common-law amalgam that ventures far afield from present Virginia law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Nothing in Virginia's current law or precedent suggests that it would abandon the age-old proposition that the "judicial power to grant a divorce . . . is founded on domicil[e]." *Williams v. North Carolina* (*Williams II*), 325 U.S. 226, 229 (1945); *see Evans v. Asphalt Roads & Materials Co.*, 72 S.E.2d 321, 324–26 (Va. 1952). There is no indication that Virginia would recognize non-domiciliary divorces—*i.e.*, divorces granted

17

by jurisdictions in which neither spouse is domiciled. I would not get ahead of the Virginia Supreme Court and purport to transform Virginia's law in this way.

Because this case concerns an alien seeking American citizenship, all "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967) (quotation marks omitted). It is at the very least doubtful that Virginia would extend comity to a divorce granted by a foreign country to non-domiciliaries. I would therefore hold that the petitioner has not carried his burden to show that Virginia would recognize the Ghanaian divorce at issue.

I.

A.

The Supreme Court has explained that "[u]nder our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil[e]." *Williams II*, 325 U.S. at 229. The word "domicile" comes from the Latin *domus*, meaning home. "Domicil[e] implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance." *Id.* That is why a spouse's domicile in a state gives the state power "to dissolve a marriage wheresoever contracted." *Id.* at 229–30; *see also Williams v. North Carolina* (*Williams I*), 317 U.S. 287, 297 (1942) (explaining that domicile is "essential in order to give the court jurisdiction which will entitle the divorce decree to extraterritorial effect"). "The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it." *Williams II*, 325 U.S. at 229.

18

The Supreme Court of Virginia has proven no exception. Virginia, taking its cue from the United States Supreme Court, has recognized that it is the "[d]omicile of one party to the divorce proceeding" that "creates an adequate relationship with the state to justify its exercise of power over the marital relation." *Evans*, 72 S.E.2d at 324, 326 (citing, *inter alia*, *Williams I*, 317 U.S. at 298). "It is well settled that each state has exclusive control over the marital status of those *domiciled* within its borders." *Id.* at 324 (emphasis added). Because domicile ensures the existence of a connection between the spouses and the state strong enough to justify that state's jurisdiction over the marriage, the "fact of domicile" is the "controlling question." *Id.* (citing *Humphreys v. Humphreys*, 123 S.E. 554, 559–60 (Va. 1924), and *McFarland v. McFarland*, 19 S.E.2d 77, 81–82 (Va. 1942)).

## B.

Virginia's view that domicile creates an adequate relationship with the state to support the state's jurisdiction over the marriage is exemplified by its caselaw and its own requirements for granting a divorce.

First, the Virginia caselaw. The majority cannot muster a single example of a Virginia court recognizing a non-domiciliary divorce granted by another state or country. To the contrary, the Virginia Supreme Court has refused to recognize a foreign divorce explicitly because domicile was lacking. *See Howe v. Howe*, 18 S.E.2d 294, 300 (Va. 1942) (refusing to extend comity to a divorce granted by Arkansas because "Dr. Howe was never domiciled in Arkansas" and therefore its "courts were without jurisdiction").

Second, Virginia's own divorce statute. Virginia has long required that at least one spouse be domiciled in the Commonwealth before granting a divorce. *See Towson v.*

*Towson*, 102 S.E. 48, 52 (Va. 1920) ("Section 2259 of the Code (1904) declares that no suit for divorce shall be maintainable in the courts of this commonwealth unless one of the parties has been domiciled in the state for at least one year preceding the commencement of the suit."). Today, no suit for divorce may be maintained in Virginia unless at least one spouse has been "for at least six months preceding the filing of the suit an actual bona fide resident and domiciliary of the Commonwealth." Va. Code § 20-97. This requirement is further evidence that Virginia views domicile as a prerequisite to jurisdiction to grant a divorce.[1]

The majority muses that because Virginia's underlying concern is with the existence of an adequate connection between the spouses and the state to justify jurisdiction over the marriage, the Virginia Supreme Court would recognize citizenship as an "acceptable alternative to domicile." Maj. Op. at 9–12. The majority asserts that citizenship in a foreign state "implies a nexus between person and place of such permanence as to control the creation of legal relations." *Id.* at 12 (quoting *Williams II*, 325 U.S. at 229). But that sentence from *Williams II* expressly uses the term "domicil[e]," *not* citizenship. Tellingly,

---

[1] The majority emphasizes that because § 20-97 presumes that members of the armed forces stationed in Virginia for at least six months are domiciled in the Commonwealth, that statute indicates that domicile in the traditional sense is not an invariable requirement for jurisdiction to grant a divorce. Maj. Op. at 14 n.4. But this narrow dispensation for military servicemembers proves the rule that domicile is generally required for jurisdiction. In fact, § 20-97 emphasizes domicile's *importance* by granting servicemembers a presumption of domicile when it just as easily could have exempted them from the domicile requirement altogether. Moreover, this presumption is evidence of the general importance of domicile to jurisdiction everywhere: If servicemembers stationed in Virginia for at least six months could not obtain divorces in the Commonwealth, they would have difficulty obtaining divorces *anywhere* given the likely difficulty of proving domicile in any other state while they were stationed in Virginia.

the majority cites no Virginia case for the proposition that citizenship without domicile is an adequate basis for jurisdiction. The majority instead grasps at straws like a California Supreme Court concurrence, a Third Circuit case, a Restatement of Foreign Relations Law, and a Hague Convention on divorces. *See id.* at 10–11. All good sources to be sure, but what relevance does this disparate assemblage bear to Virginia law?

Surprisingly, the majority cites *Howe* for the proposition that the Virginia Supreme Court has recognized a connection between citizenship and a sovereign's authority to grant a divorce. Maj. Op. at 9–11. It builds its case on just a single use of the word "citizenship" in that opinion, in the following context: "One would have to be incredibly credulous to believe that Dr. Howe went to Arkansas intending to establish a domicile there. For the purposes of citizenship he stood exactly as he would have stood had he gone to hunt bear in the canebrakes of that State." *Howe*, 18 S.E.2d at 296. This passage does not begin to support the proposition that *citizenship without domicile* in the international context is sufficient to create jurisdiction to grant a divorce. In contrast to this stray reference to citizenship, the *Howe* opinion mentions "domicile" *twenty-six times*, stating that "[e]ach state has exclusive control of the matrimonial status of those *domiciled* within its borders," Dr. Howe "must have at least acquired an Arkansas *domicile*," "statutory requirements for *domiciliary residence* are jurisdictional," and "[s]ince Dr. Howe was never *domiciled* in Arkansas, its courts were without jurisdiction." *Id.* at 297, 300 (emphasis added). I am surprised that the majority relies on a decision that so disproves its point.

There are additional reasons to be skeptical. Virginia's caselaw emphasizes that *domicile* creates a relationship sufficient to support jurisdiction and, crucially, we have

recognized that *domicile goes beyond mere citizenship*: "As a general matter, a domicile is understood to be 'a person's true, fixed, principal and permanent home.'" *Jahed v. Acri*, 468 F.3d 230, 236 (4th Cir. 2006) (quoting Black's Law Dictionary 523 (8th ed. 2004)). Someone may have multiple citizenships by operation of law, but as a factual matter a "person can have only one domicile." 23 Va. Admin Code § 10-110-30(B). It is hardly implausible therefore that domicile constitutes a connection that is strong enough to support jurisdiction but citizenship does not: Domicile, not citizenship, refers to a person's one "fixed, *principal and permanent* home," so only domicile "implies a nexus between person and place *of such permanence* as to control the creation of legal relations." *Williams II*, 325 U.S. at 229 (emphasis added).

The instant case is Exhibit A. While the relevant parties, Barbara Boateng and Kingsley Gyasi, were citizens of Ghana at the time of the decree, neither the petitioner nor the majority contends that they were domiciliaries of Ghana. They had moved to and became lawful permanent residents of the United States. As such, Virginia would view their state of residence—*not* Ghana—as having "exclusive control over the[ir] marital status" because they are "domiciled within its borders." *Evans*, 72 S.E.2d at 324. It is therefore highly doubtful that Virginia would view Ghana as having jurisdiction to grant a divorce to these United States domiciliaries.

## II.

Why would Virginia extend comity to a Ghanaian divorce decree that it views as beyond Ghana's power to grant? Comity is the recognition that a sovereign gives to another's acts "having due regard both to international duty and convenience, and to the

rights of its own citizens, or of other persons who are under the protection of its laws."

*Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Because comity is "a matter of favor or

courtesy" and the "control and recognition of marriage is left to each State in its sovereign

capacity," "no State is bound by comity to give effect in its courts to the divorce laws of

another State repugnant to its own laws and public policy." *McFarland*, 19 S.E.2d at 82–

83.

The majority recognizes these principles and cites Virginia's general test for

whether to extend comity. Maj. Op. at 6–7. Under that test, (1) "the foreign court must have

personal and subject matter jurisdiction to enforce its order within its own judicatory

domain"; (2) "the procedural and substantive law applied by the foreign court must be

reasonably comparable to that of Virginia"; (3) "the foreign court's order must not have

been falsely or fraudulently obtained"; and (4) "enforcement of the foreign court's order

must not be contrary to the public policy of Virginia, or prejudice the rights of Virginia or

her citizens." *Am. Online, Inc. v. Nam Tai Elecs., Inc.*, 571 S.E.2d 128, 133 (Va. 2002).

The majority's application of this test is questionable at best.

Begin with the requirement that Ghana's "procedural and substantive law" of

divorce must be "reasonably comparable to that of Virginia." *Id.* The majority mentions

but skims over the key procedural difference between Ghanaian and Virginia divorce law:

Virginia requires at least one spouse to be domiciled in the state for at least six months,

Va. Code § 20-97, but Ghana has no such requirement. Indeed, Ghanaian law apparently

does not require either spouse to be present in the country at the time of divorce—or even

to have set foot in the country for years. Given the tight link that Virginia caselaw has

drawn between domicile and jurisdiction to grant a divorce, this is no small difference. Moreover, Ghanaian law allows parties to divorce based on a tribal ceremony in which the spouses do not even participate, as long as the spouses' family members are involved. *See In re Kodwo*, 24 I&N Dec. 479, 481–82 (BIA 2008). Virginia has no similar procedure. These differences are significant and cast doubt on whether the Virginia Supreme Court would find Ghana's divorce law reasonably comparable to Virginia's.

It is also likely that the Virginia Supreme Court would find that extending comity to the Ghanaian divorce decree would contravene Virginia's public policy. As explained in Part I, Virginia's precedents and divorce statute reflect the view that domicile is essential to a jurisdiction's power to grant a divorce. It is not citizenship but domicile—where the spouses make their principal and permanent home—that signals the existence of a sufficient nexus with the jurisdiction to justify its exercise of power over the marriage. *See Evans*, 72 S.E.2d at 326. In other words, Virginia's public policy holds that the power to grant a divorce is based on territorial control over the land upon which the spouses live: "each state has *exclusive* control over the marital status of those *domiciled within its borders*." *Id.* at 324 (emphasis added).

Because the power to grant a divorce belongs exclusively to the state in which the spouses currently reside, it would contravene Virginia public policy to recognize a Ghanaian divorce granted to non-domiciliaries—a divorce decree that, in Virginia's view, Ghana was powerless to grant. Respect for the sovereignty of the state in which the spouses *are* domiciled requires this conclusion. *See McFarland*, 19 S.E.2d at 82–83. Moreover, enabling another jurisdiction to exercise power to end the marriage threatens to introduce

additional unpredictability and jurisdictional conflict into the sphere of family relations—a result Virginia has taken pains to avoid.

III.

Ultimately, because this case concerns an applicant for American citizenship, all "doubts should be resolved in favor of the United States and against the claimant." *Berenyi*, 385 U.S. at 637 (quotation marks omitted) (explaining that "it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect"). Given Virginia's view on the relationship between domicile and the power to grant a divorce and how this public policy would affect the comity analysis, it is doubtful that the Virginia Supreme Court would extend comity to the Ghanaian divorce at issue here. Petitioner has thus failed to carry his burden.

Family relations lie at the heart of state sovereignty and state-court competency. States have a sovereign interest in the "control and recognition of marriage," *McFarland*, 19 S.E.2d at 82, and state tribunals have developed a "special proficiency . . . over the past century and a half" in handling divorces, *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992). It is certainly within the prerogative of the Commonwealth of Virginia to steer Virginia law down the path that the majority favors, away from the state's paramount emphasis on domicile. Because I would wait for the Virginia Supreme Court to effect any such fundamental shift in Virginia law, I respectfully dissent.

As federal judges, we must give effect to Virginia law and policy as they currently stand, not move state law in our preferred direction. Federal common law once gave federal courts this open range freedom, *see Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842), and I am

sorry to see the majority revert. Its decision is a throwback to a discredited era, to a day when wisdom reigned supreme on the bench, not in the given law and structure of our federal system. Declaring that Virginia would recognize non-domiciliary divorces in foreign jurisdictions is a step that lies far beyond our legal authority to take. I would affirm the judgment of the district court.